**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Alberto Guzman,<br><br>                Plaintiff,<br><br>v.<br><br>Liberty Mutual Insurance Company,<br><br>                Defendant. | No. CV-16-00530-PHX-NVW<br><br>**ORDER** |

Before the Court is Defendant's Motion for Summary Judgment (Doc. 28).

**I.    FACTUAL BACKGROUND**

Plaintiff Alberto Guzman ("Guzman") is an insurance salesman and motorcyclist from Arizona. Defendant Liberty Mutual Insurance Company ("Liberty Mutual") is a Massachusetts corporation with its principal place of business in Massachusetts. Liberty Mutual was Guzman's motorcycle insurance carrier when the events below took place.

**A.    The Accident**

On September 9, 2015, at around 2:30-3:00 p.m., Guzman was riding his Harley Davidson home from work. He was using the high-occupancy vehicle ("HOV") lane on Phoenix's Loop 202 highway headed west toward I-10.

From this point, Guzman has his own version of the events.[1] Guzman's current story is that traffic in the HOV lane was moving such that he could travel at about 37-38

---

[1] In Guzman's statement controverting Liberty Mutual's facts, submitted per LRCiv 56.1(b), he marked as "disputed" numerous facts without citing any evidence of record. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely

MPH. Shortly after merging onto I-10, he claims, an unidentified phantom vehicle quickly cut him off from his right side. Guzman states that the phantom vehicle was a light color but can remember nothing about the car's make or model or about the driver. Although the two vehicles never collided, they came very close. Guzman says he needed to suddenly apply his brakes, causing him to fall off the bike. He did not deliberately lay the bike down, a technique motorcyclists sometimes use to prevent greater physical harm; instead, when he applied the brakes, they locked up, he lost control, and the bike slid onto its side. Guzman sustained various injuries, including fractures on his right arm and big toe, as well as road rash on his chest and legs. The arm fractures required surgery.

Others remember the accident and the aftermath differently. Officer Clinton Schmidt arrived shortly after the action to investigate the scene. As paramedics transported Guzman to Good Samaritan Hospital, Schmidt spoke to two witnesses: Stephanie Skor and Kovasky Aguiar. Schmidt avers that neither witness mentioned the phantom vehicle. Rather, they each saw that the car in front of Guzman halted very quickly—and that Guzman was himself unable to stop safely.

Liberty Mutual later deposed Skor, and she expanded upon her earlier remarks to the officer. Skor apparently is keenly aware of motorcyclists, as some in her family are riders and a friend recently perished in a motorcycle-related accident. She thus noticed Guzman in the HOV lane about two minutes before the accident. She recalls, unlike Guzman, that traffic in the HOV lane had slowed to the same stop-and-go speed of the other lanes—about 10-15 MPH. Skor also said, "I feel like the other lanes were going a lot quicker than the carpool lane, to be completely honest with you." (Doc. 29, Ex. F at 18:18-20.) Guzman points out that Skor disagrees with Schmidt's diagram of the accident. (Doc. 31-2 at 34:4-24.) Guzman does not, however, dispute Skor's statement "that immediately before [Guzman] laid down his motorcycle, both the car in front of her

---

disputed must support the assertion by[ ] citing to particular parts of materials in the record . . . ."). The Court therefore considers these facts undisputed. Fed. R. Civ. P. 56(e)(2).

and the car in front of [him] came to a sudden stop," which is when he fell over and landed in front of her car. (Doc. 29 at ¶ 25.)

Aguiar, by contrast, is missing. Guzman says he talked by phone with Aguiar after the accident. He asserts that Aguiar told Guzman that he had seen the phantom vehicle. Contradicting that assertion, Schmidt says Aguiar's statement was consistent with Skor's. Unfortunately, Aguiar never responded to Liberty Mutual's deposition subpoena, with which he was properly served, so he has not helped to sort this out.

Once Schmidt was done at the scene, he visited Guzman in the hospital to get his statement.[2] According to Schmidt's accident report, and consistent with what the witnesses had told the officer, Guzman "stated that he was traveling westbound . . . when traffic suddenly stopped and he was unable to stop before laying his motorcycle down and falling off of it." (Doc. 29, Ex. B at 4.) Nowhere does the report mention the phantom vehicle. In addition, Schmidt cited Guzman for driving on the "highway at a speed greater than [was] reasonable and prudent under the circumstances, conditions[,] and actual and potential hazards then existing." (Doc. 29, Ex. C at 29:5-29:8 (referencing A.R.S. § 28-701(A)).) At Skor's deposition, she largely agreed with how Schmidt described the events. (Doc. 29, Ex. F at 40:19-41:16.)[3] For his part, Guzman denies that this is what he told the officer. (Doc. 31-1 at 181:13-182:2.)

### B. Liberty Mutual's Investigation

Guzman contacted Liberty Mutual on September 10, 2015, the day after the accident. Over the course of the next month and a half, the insurer made payments to Guzman for several things, including the towing of and repairs to the bike and the

---

[2] Again, Guzman disputes this fact without citation to any supporting evidence: "Officer Schmidt did not take a statement of Mr. Guzman while at the hospital." (Doc. 31 at 2:15.) His denial is disregarded on summary judgment. Schmidt's deposition reveals that his car's computer history would show that he was at the hospital. (Doc. 29, Ex. C at 11:10-12:4.)

[3] Guzman asserts that "Ms. Skor disagrees with the [*sic*] Officer Schmidt's accident report and goes as far to state it is completely wrong." (Doc. 31 at 3:6-7.) He cites no evidence for this, and it is disregarded.

damage to his helmet. These property-based payments totaled $4,483.32 under his casualty coverage.

The dispute in this case, then, is whether Liberty Mutual should pay Guzman's *medical* expenses under his uninsured motorist coverage. On October 13, 2015, Liberty Mutual assigned Christina Cross, a Senior Claim Resolution Specialist, to Guzman's case. Although Cross called Guzman that day, the two were unable to connect by phone until October 19, 2015. Cross then recorded Guzman's statement, in which he relayed that the phantom vehicle had cut him off and that he had braked to avoid it.

Because it would be faster than going through the police, and because she did not have the police case number, Cross also asked Guzman for a copy of the police report. Guzman sent a copy two days later, but the file he sent was unreadable. Cross asked for another version on October 23, 2015. Guzman did not respond to this request.

On November 2, 2015, Guzman informed Cross that he had retained counsel. Cross immediately contacted Guzman's attorney to get the police report—to no avail. She asked again on November 13, 2015, and still did not receive the report. That day, she also sent Guzman's attorney a letter to inform him that she was attempting to obtain corroborating evidence for the uninsured motorist claim. After Cross called again on November 17, 2015, to request the report, Guzman's attorney's office eventually sent it.

Cross reviewed the report on November 30, 2015. She learned about Skor and Aguiar, the two witnesses the report mentions, and called them both three times over the next week, leaving messages each time. Aguiar never picked up, but Skor did on the third call. Consistent with her previous remarks, Skor gave a recorded statement that no car had cut Guzman off. Cross later called Aguiar again and left another message, but he has never responded.

Based on these facts, Cross denied Guzman's uninsured motorist claim. On December 30, 2015, she sent a denial letter to Guzman's attorney. The letter stated that Liberty Mutual had found no corroborating evidence to support the phantom-vehicle theory. It also invited Guzman to submit any such information.

### C. This Action

On January 22, 2016, Guzman filed an action against Liberty Mutual in Maricopa County Superior Court. He alleged breach of contract and bad faith, and he sought punitive damages. Liberty Mutual removed the case to this Court on February 26, 2016, and it answered the complaint on March 2, 2016. After discovery closed, Liberty Mutual moved for summary judgment on all claims.

## II. LEGAL STANDARD

A motion for summary judgment tests whether the opposing party has sufficient evidence to merit a trial. Summary judgment should be granted if the evidence reveals no genuine dispute about any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one that might affect the outcome of the suit under the governing law, and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

It is the moving party's burden to show there are no genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Upon such a showing, however, the burden shifts to the non-moving party, who must then "set forth specific facts showing that there is a genuine issue for trial" without simply resting on the pleadings. *Anderson*, 477 U.S. at 256. To carry this burden, the nonmoving party must do more than simply show there is "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Id.* at 587. "A court must view the evidence 'in the light most favorable to the [non-moving] party.'" *Tolan v. Cotton*, — U.S. —, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 249).

## III. ANALYSIS

### A. Breach of Contract

The Arizona Uninsured Motorist Act controls uninsured motorist policies in Arizona. *See generally* A.R.S. § 20-259.01. The statute speaks to the present situation, where an insured makes an uninsured motorist claim "based on an accident that involved an unidentified motor vehicle and no physical contact with the motor vehicle occurred." *Id.* § 20-259.01(M). In such cases, the insured must corroborate the claim "that the unidentified motor vehicle caused the accident." *Id*. To corroborate properly, the insured must offer "any *additional and confirming* testimony, fact or evidence that strengthens and adds weight or credibility to the insured's representation of the accident." *Id.* (emphasis added).

Guzman's policy with Liberty Mutual contained the same corroborating-evidence requirement for uninsured motorist claims. The policy provided that Liberty Mutual would pay compensatory damages that an insured would be "legally entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injury." (Doc. 29, Ex. K at LMIC 000097.) Under the policy, an uninsured motorist included a hit-and-run vehicle—a phantom vehicle—that does not collide with the insured's person or vehicle. (*Id*.) As noted, the policy required corroboration. "Corroboration means any additional and confirming testimony, fact or evidence that strengthens and adds weight or credibility to [a] person's representation of the accident." (*Id*.)

Guzman has not corroborated his claim about a phantom vehicle. He has failed to submit any admissible "additional and confirming" evidence. Guzman contends that Skor corroborates his story because she "confirm[ed] that a vehicle in front of [him] slammed on its brakes." (Doc. 30 at 11.) That is not disputed and is not what needs corroborating. Under the terms of the statute and the policy, Guzman's testimony alone is insufficient.

Guzman testifies that Aguiar told him on the phone that he had seen the phantom vehicle. Yet such evidence is plainly hearsay—a declarant's out-of-court statement

offered for the truth that the phantom vehicle almost hit Guzman. *See* F.R.E. 801. There are no colorable hearsay exceptions, so Aguiar's statement is inadmissible. *See* F.R.E. 802. Because the Court considers only admissible evidence in ruling on a motion for summary judgment, *see Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e)), Guzman is left with only his own words to support his claim.

Normally, when two sides offer differing accounts of an event, it is up to the jury to decide which to believe. In this case, however, Guzman has failed to meet his statutory and contractual burden of corroborating evidence as a matter of law.

### B. Bad Faith

Arizona law recognizes in every contract an implied covenant of good faith and fair dealing. *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 490, 38 P.3d 12, 28 (2002). The accompanying duty requires "that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." *Rawlings v. Apodaca*, 151 Ariz. 149, 153, 726 P.2d 565, 569 (1986).

An insurer acts in bad faith where it "intentionally denies, fails to process, or pay a claim without a reasonable basis." *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 237, 995 P.2d 276, 279 (2000) (quoting *Noble v. Nat'l Am. Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981)). For an insurer to have a good-faith basis to deny a claim, the claim's validity must be fairly debatable. *See Rawlings*, 151 Ariz. at 156, 726 P.2d at 572 ("A failure to pay a claim is unreasonable unless the claim's validity is 'fairly debatable' after an adequate investigation."). However, "while fair debatability is a necessary condition to avoid a claim of bad faith, it is not always a sufficient condition." *Zilisch*, 196 Ariz. at 238, 995 P.2d at 280. Rather, the test is whether "reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." *Id.* (citing *Noble v. Nat'l Am. Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981)). A finding of bad faith thus requires two inquiries, one objective

(reasonableness) and one subjective (the insurer's state of mind). *See Nardelli v. Metro. Grp. Prop. & Cas. Ins. Co.*, 230 Ariz. 592, 597-98, 277 P.3d 789, 794-95 (Ct. App. 2012). Fair debatability is merely one factor in assessing the objective aspect, i.e., whether the insurer's denial was reasonable. *Milhone v. Allstate Ins. Co.*, 289 F. Supp. 2d 1089, 1094 (D. Ariz. 2003) (citing *Deese v. State Farm Mut. Auto Ins. Co.*, 172 Ariz. 504, 507, 838 P.2d 1265, 1268 (1992)).

Liberty Mutual's agent, Cross, called Guzman as soon as she was assigned his uninsured motorist claim. She obtained his recorded statement and a promise that he would deliver the police report. She attempted no fewer than five times to get the report.

In any event, the police report failed to support Guzman's story in every respect. Once Cross obtained the report, she saw that Guzman had told the officer a different story—that traffic suddenly stopped and that he could not safely brake in time. She also discovered the names of the two witnesses, Skor and Aguiar. Over the course of about a week, she called both witnesses three times, leaving messages when they did not pick up. She reached Skor on the third attempt, but she never reached Aguiar, whom she called at least once more. In a recorded statement, Skor denied ever having seen the phantom vehicle.

Thus, to Cross, this was the evidence: on the one side, Guzman's uncorroborated and changed claim; on the other, a police officer's report (containing Guzman's original claim and resulting in a citation) and the one witness with whom she was able to speak. As explained above, Cross could not lawfully honor the policy without *something* to corroborate Guzman's story. In the denial letter that Cross sent to Guzman's attorney, she invited Guzman to offer any available evidence and noted that Liberty Mutual would be pleased to consider it.

Even when viewed in the light most favorable to Guzman, the facts indicate that Liberty Mutual fairly investigated, evaluated, and reasonably denied his claim. The denial was correct as a matter of law. A reasonable juror could not conclude that Liberty

Mutual or its agents acted unreasonably or knew that their conduct was unreasonable. Liberty Mutual did not act in bad faith.

### C. Punitive Damages

Recovering punitive damages requires proof beyond the tort of bad faith. To receive punitive damages, "a plaintiff must prove by clear and convincing evidence that the defendant's conduct was undertaken with an evil mind." *Tritschler v. Allstate Ins. Co.*, 213 Ariz. 505, 517, 144 P.3d 519, 532 (Ct. App. 2006) (internal quotation marks omitted). An "evil mind" requires either that the "defendant intended to injure the plaintiff" or that the "defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Rawlings*, 151 Ariz. at 162, 726 P.2d at 578.

As discussed above, Liberty Mutual is not liable for breach of contract or bad faith. Further, Guzman has not established by any evidence, let alone clear and convincing evidence, that Liberty Mutual acted with an "evil mind." Nothing indicates that Liberty Mutual intended to injure Guzman or that it created a substantial risk of significant harm to anyone. Liberty Mutual did not injure Guzman. Guzman's punitive damages claim fails completely.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment (Doc. 28) is granted.

IT IS FURTHER ORDERED that the clerk enter judgment in favor of Defendant Liberty Mutual Insurance Company against Plaintiff Alberto Guzman and that Plaintiff take nothing.

The clerk shall terminate this case.

Dated this 28th day of September, 2017.

_____
Neil V. Wake
Senior United States District Judge